# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. DEVIN ROGERS

**Appeal from the Criminal Court for Shelby County**
**No. 12-01862      James M. Lammey, Jr., Judge**

_____

**No. W2013-02442-CCA-R3-CD  - Filed February 25, 2015**

_____

The defendant, Devin Rogers, was convicted by a Shelby County Criminal Court jury of aggravated robbery, a Class B felony, and was sentenced to eleven years in the Tennessee Department of Correction.  On appeal, he argues that the trial court erred in denying his motion to suppress his statement to police and that the evidence is insufficient to sustain his conviction.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Devin Rogers.

Herbert H. Slatery, III, Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for one count of aggravated robbery as a result of his participation in the robbery of Foodland grocery store in Memphis, Tennessee, on November 17, 2011.

### Motion to Suppress

Prior to trial, the defendant filed a motion to suppress his statement to police.  The

defendant asserted that he was questioned at length before being "properly mirandized" and that the statements he gave "were the result of threats, force and/or coercion." He additionally asserted that the investigators "made promises and assurances about the potential cases against him and those promises and assurances overcame his will not to speak or give statements to the investigators."

The trial court conducted a hearing on the defendant's motion at which Officer Lawrence Barr with the Memphis Police Department testified that he received a call from dispatch on December 3, 2011 that the defendant was in the parking lot of his apartment complex and that he matched the description of a suspect involved in a recent aggravated robbery. Officer Barr confirmed that the defendant matched the description and took him into custody. The defendant did not give his real name or correct identifying information to the officers. Officer Barr and his partner transported the defendant to the police station and, while en route, did not ask the defendant any questions or converse with him. Officer Barr did not read the defendant his Miranda rights at that time because he did not have any questions for the defendant. The defendant did not appear to be under the influence and was cooperative with the officers, aside from giving them a false name and birth date.

Detective Fausto Frias with the robbery unit of the Memphis Police Department testified that he participated in the investigation of several aggravated robberies that involved an individual by the defendant's name. On December 3, 2011, Detective Frias received a call from a witness in another robbery that the person responsible for that robbery was at her apartment complex, and the witness gave a description and location for that individual. Detective Frias had uniform patrol respond to the scene, and the officers brought the defendant to the police station. The defendant initially gave the officers a false name and identifying information. However, when told that he was going to be fingerprinted to ascertain his identity, the defendant told Detective Frias that his name was Devin Rogers and that he had been afraid to give his real name because there was an active burglary warrant out on him.

Detective Frias testified that it took him approximately one hour to research Devin Rogers and confirm that there was a burglary warrant for him. After which, he advised the defendant of his Miranda rights by reading them out loud to the defendant as well as going through them line-by-line. The defendant verbally acknowledged that he understood his rights, then read and signed the advice of rights form.

Detective Frias testified that he explained to the defendant that he was being investigated because he was implicated in a robbery, and the defendant initially denied any involvement in a robbery. The detective asked the defendant to recall what he did the day of the Foodland store robbery, and the defendant said that he "couldn't remember that far

-2-

back." The detective told the defendant that he had witnesses who told him that the defendant committed the robbery, and then the defendant confessed and explained his actions in detail. Detective Frias told the defendant that he would document his statement by typing it. The defendant admitted participating in several robberies, including the one in this case. The defendant gave separate statements for each robbery.

Detective Frias testified that at no time during the interview and giving of the statement did the defendant indicate that he was in physical discomfort or request to have an attorney present. The defendant was given several restroom breaks, as well as food to eat. The defendant was cooperative throughout the process and seemed to understand what was going on. Detective Frias stated that the defendant "was very remorseful and sorry for everything he's done."

On cross-examination, Detective Frias agreed that the defendant arrived at the police station at 3:20 p.m., and the advice of rights was read to him at 4:42 p.m. Detective Frias explained that, during that time period, he introduced himself to the defendant and informed the defendant why he was there. Then, it took thirty minutes or more to ascertain the defendant's real name because he gave officers false identifying information. Detective Frias said that he did not ask the defendant any incriminating questions during that time, but instead asked him his name, address, social security number, birth date, and other identifying information.

Detective Frias agreed that, when he reviewed the advice of rights form with the defendant, he asked the defendant if he suffered from any mental disorders and the defendant responded that he had ADHD and bipolar disorder. The defendant told the detective that he was taking the appropriate medications for his conditions. Detective Frias began interviewing the defendant about the present robbery around 5:00 p.m., and, by 5:30 p.m., he had admitted participating in it. Detective Frias denied threatening the defendant with life in prison before he confessed to the robbery. He also denied showing the defendant a blue piece of paper and telling him that the paper meant that he would receive life in prison or life without parole. The detective said that he did not tell the defendant that he would never see his family again if he did not confess to the robbery, or that the defendant would be free to leave if he just confessed. They began the typed statement related to this case at 6:53 p.m. Detective Frias stated that the defendant never asked for a lawyer or said that he wanted to stop talking to the officers.

Sergeant Albert Bonner, an officer with the Memphis Police Department assigned to the robbery bureau in December of 2011, testified that he assisted Detective Frias in the witness room during the questioning of the defendant. Sergeant Bonner stated that the defendant appeared to understand the detective's questions. He never asked for a lawyer or

indicated that he was in physical pain or discomfort. The defendant was offered bathroom breaks, food, and water. He did not appear to be under the influence of anything.

On cross-examination, Sergeant Bonner denied threatening the defendant, showing him a blue piece of paper to indicate that he would spend the rest of his life in prison, or telling him that he was never going to see his family again. He also denied promising the defendant anything to get him to talk or telling him that he could go home if he just confessed.

The defendant testified that he had several indictments against him for aggravated robbery and aggravated burglary and that he gave detectives statements of admission to each of the different crimes. However, he felt that the statements were obtained in an improper fashion. The defendant stated that the officers showed up at the apartment where he was staying and obtained consent to search the residence, but they did not have a warrant for his arrest. The officers did not ask his name and placed him in handcuffs. The defendant told the officers that his name was Terrelle McGhee and gave them a fake social security number. He recalled that, with the exception of when the officers took him to urinate in a garbage can, he sat handcuffed in the patrol car for an hour and then was taken to the police station. During the ride, the officers told him that he was just going in for questioning and was not under arrest. At the police station, he sat on a bench for about an hour with handcuffs around his leg and then the officers started talking to him trying to find out his real name. He had not been read his Miranda rights at that point.

The defendant testified that he eventually told the officers his real name and that he had lied to them at first because he "thought they were picking [him] up for [his] aggravated burglary." The officers then started to ask him about a robbery. When shown a copy of the advice of rights form that he signed, the defendant stated that the time noted on it was consistent with his memory. However, he said that the officers questioned him about a robbery, not the one in this case, for approximately thirty minutes before he signed the advice of rights. He said that they only gave him the advice of rights after he confessed to the robbery. Also, before he was given the advice of rights, the "Mexican" officer told him that if he kept lying, the officer would "sign a blue piece of paper" that would keep him from seeing his family again and he would "have life without parole." The defendant claimed that after the officer threatened him for forty-five minutes, he started to cry. The officer was so loud and threatening that the defendant just gave up and confessed to the robbery. The defendant said that he did not know what the Miranda rights were when all this was taking place and that the officers did not read the advice of rights form until after he signed it. The defendant acknowledged that he never asked for a lawyer and that the officers gave him food and water.

-4-

On cross-examination, the defendant claimed that he signed the statements without reading them because he was tired and wanted to go home. He also claimed that the officers repeatedly told him throughout the ordeal that he was not under arrest.

On redirect examination, the defendant stated that, at the time of questioning, he had been off his medications, Depakote and Ritalin, for two and a half weeks.

At the end of the hearing, the trial court denied the defendant's motion to suppress, finding that the defendant "was advised of his rights, he was not forced or coerced, that he freely and voluntarily waived his rights, that he freely and voluntarily gave these statements[,]" and that the defendant's testimony was not "very credible."

**Trial**

Through an interpreter, Isabel Hernandez,[1] the victim, testified that she was working as the manager at Foodland grocery store on November 17, 2011, until approximately 7:00 p.m. She went to the register to check out a regular customer, and she recalled that the customer made a phone call while she helped him. During that time, the victim's husband entered the store to visit her, and two men came in behind him. One of the men, whom the victim described as African-American, held a pistol and demanded money from a customer and that she get money out of the register. The victim told the two men that there was money in another register, and the man with the gun pointed it at her head while she led him to that register. She gave the money inside the register to the man with the gun, after pushing the emergency button to alert the police. While she gave the money to the man with the gun, the other man "was grabbing merchandise out from under the counter . . . [and] stuffing it into a backpack that he brought with him." The victim walked back to the other register and told the men to "[j]ust take everything."

The victim testified that, after the police arrived, she noticed a cell phone lying on the ground, and it began to ring. She told the police that it was not part of the store merchandise and did not belong to her or any other employee. She told the police that the robbers took cell phones, cigarettes, contact lenses, and watches, essentially the "expensive things" that were kept at the front of the store, as well as one of the cash registers. She recalled that the two men who robbed the store had coverings over their faces. One had on a Halloween mask and a short-sleeved shirt. The other had a bandana around part of his face and carried a black backpack. She could not see their faces.

---

[1] Because the victim and her husband, another witness, share the same surname, we will refer to the victim as "the victim" and her husband as "Hernandez."

The video surveillance system at the store captured the events, and the video was played for the jury. Thereafter, the victim was questioned regarding the regular customer she was helping when the robbers entered the store. She said that he had on a blue cap and that she had seen him in the store prior to the night of the robbery. She recalled that he left behind his identification card and credit cards.

On cross-examination, the victim testified that her description of the robbers to the police came from what little she could see of their faces and hands. She described both men as African-American with an approximate height of 5'10".

Also through an interpreter, Candido Hernandez, the victim's husband, testified that, on November 17, 2011, he stopped by the grocery store where the victim worked just like he did after every work day. When he arrived, he saw two people standing on the corner just outside the store and in the process of covering their faces. Hernandez saw that the men were walking toward the store, so he exited his vehicle and walked in just ahead of them to warn his wife. One of the men aimed a gun at him and then at the victim, as the man demanded money from the cash register which the victim proceeded to hand over. Hernandez saw one of the men grab a cash register, and both men fled the store. He chased after them, calling 911 in the process. Hernandez said that the men never went to the back of the store and did not take any food items during the robbery. He confirmed that the men took cell phones, cigarettes, and a computer. Hernandez used a map to show the jury where he first encountered the two men and where they went after leaving the store.

Officer Christopher Slaughter, a crime-scene investigator with the Memphis Police Department, testified that he assisted with processing the scene at the Foodland grocery store on November 17, 2011. He identified several photographs taken at the scene and of the stolen cash register that was recovered.

Officer Michael Spearman, a crime-scene investigator with the Memphis Police Department, testified that he also participated in processing the scene in this case. He identified items recovered from the scene and said that he attempted to lift fingerprints from the cash register, but only "smudges" were detected. He did not dust other items for fingerprints.

Officer David Galloway, a crime-scene investigator with the Memphis Police Department, testified that he participated in a follow-up investigation at the Foodland grocery store on November 18, 2011. He identified a backpack containing the stolen merchandise, as well as a gun magazine recovered nearby. He said that no fingerprints "of value" were recovered from any of the items, including the backpack.

Officer Desmond Gibbs with the Memphis Police Department testified that he received a request to pick up a robbery suspect on December 3, 2011. He located a person matching the suspect's description at the given address, and he identified the defendant in court as the suspect. Officer Gibbs said that the defendant, however, gave him the name of "Terrell McGee" instead of his real name.

Detective Frias testified that he developed the defendant as a robbery suspect and had him brought in for questioning. After the defendant arrived at the police station, it took Detective Frias an hour to obtain his identity because the defendant initially gave a false name, date of birth, and social security number. The defendant only gave his correct name and information after Detective Frias told him that he would have to be fingerprinted for his real information.

Detective Frias testified that, after ascertaining the defendant's correct information, he read the defendant his Miranda rights and began an oral interview. The detective specifically recalled that the defendant read the Miranda rights out loud to the officers, the officers went over the rights line by line with the defendant, and the defendant acknowledged verbally and in writing that he understood his rights. The defendant appeared to understand what was going on and did not appear to be under the influence at the time he acknowledged that he understood his rights.

Detective Frias testified that he asked the defendant about a case he was investigating, and the defendant gave a written statement. Specifically, the defendant relayed facts of the robbery to the detective, and the detective typed the statement. In his statement, the defendant admitted to participating in the robbery of the Foodland store on November 17, 2011. The defendant said that two other individuals, "Terry Townsend" and "Ray," were involved in the robbery. He claimed that Townsend was armed with a weapon, "a chrome 380." He said that they took a cash register, cigarettes, and "some food – like chicken, cereal, milk, and washing powder" from the store. However, they did not really get away with anything because he "dropped the register" and the others "dropped the food." They only got away with "the tissue and milk and stuff." He claimed that Townsend suggested the robbery because their refrigerator was empty and they had "babies and toddlers at the house, and they were crying like they were hungry."

Detective Frias testified that the defendant continued in his statement that Townsend went into the store to look around, then came back outside and told him and Ray that it was time to go in. Townsend put on a mask, the defendant wrapped a shirt around his head, and Ray entered the store pretending to be a customer. The defendant and Townsend planned to enter the store when Ray sent them a text saying, "Go time." After they received the text, the defendant and Townsend ran into the store. Townsend pointed a gun at "the Mexican lady"

and demanded money. They treated Ray like a customer and pointed a gun at his head and "then made him get off the ground and take a basket of food with him outside." The defendant said that he was unable to open the cash register, so he took the register with him out of the store.

The defendant was shown photographs, from which he identified Townsend and Ray as the people "responsible for committing the robbery with [him]." The defendant said that all three of them wore black clothing, he had a black shirt tied around his head, Townsend wore "a screen mask," and Ray did not have on a mask. He said that he did not know the whereabouts of the gun that was used in the robbery because it belonged to Townsend.

The defendant initialed and signed the statement as being true and accurate, and Detective Frias and the other officer present also initialed the statement. The defendant was given the opportunity to make changes to the statement, but he did not do so. Detective Frias recalled that the defendant appeared alert and attentive throughout the whole process. Afterwards, the defendant was taken to the jail for booking and processing. Detective Frias testified that the name of the person the defendant referred to as Ray is Howard McClain.

Sergeant James Taylor with the Memphis Police Department testified that he was the lead investigator on the case. It was reported that one of the suspects had dropped his wallet and cell phone during the robbery and, while he was reviewing the report, he was notified that Howard McClain had contacted the police to report that he had lost his wallet and cell phone. He requested that McClain be brought in for questioning because it was "very obvious that he was involved in the robbery." Sergeant Taylor then developed the defendant and Josh Rankin as the other two suspects in the robbery.

Sergeant Taylor testified that he spoke with the defendant on December 5, 2011, but that he first advised the defendant of his Miranda rights and the defendant signed the warning form acknowledging that he had been informed of his rights and wished to talk to the officers. Sergeant Taylor prepared a still shot photograph from the store's surveillance video that showed the robbers entering the store. He asked the defendant to identify the suspects in the photograph, and the defendant identified himself as one of the men and the other as "Josh." Sergeant Taylor stated that, when he interviewed the defendant, the defendant did not appear to be under the influence and seemed to understand everything that was going on.

On cross-examination, Sergeant Taylor admitted that, during his interview of Howard McClain, McClain provided names of those involved in the robbery. McClain named Terry Townsend as an accomplice, and Townsend was arrested but later released. McClain did not name the defendant as an accomplice.

The defendant elected not to testify or present any proof.

After the conclusion of the proof, the jury convicted the defendant of aggravated robbery as charged in the indictment.

## ANALYSIS

### I. Motion to Suppress

The defendant argues that the trial court erred in not suppressing his statement to the police. He specifically asserts that he was questioned prior to the administration of his Miranda rights, he was threatened with a life sentence if he did not admit to committing the robbery, and his typed statement was "full of errors."

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S .W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a

confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

After hearing the testimony at the suppression hearing, the trial court denied the defendant's motion to suppress his statement, finding:

> [The defendant] was advised of his rights, he was not forced or coerced, that he freely and voluntarily waived his rights, that he freely and voluntarily gave these statements.
>
> I don't find that in any way he was coerced by the officers. I don't find his testimony to be very credible.
>
> In light of the fact that I have five specific and detailed statements that he acknowledged that he signed, the Court is satisfied that [the defendant] understood what he was doing. I don't find that there was any threats or coercion involved in these cases, so I'll deny the motion to suppress and allow the statements to be introduced as exhibits.

The evidence does not preponderate against the trial court's findings. Detective Frias testified that he advised the defendant of his Miranda rights by reading them out loud and going through them line-by-line prior to questioning him about the robberies. The detective said that the defendant confessed his involvement shortly into the questioning and gave details of his actions. Detective Frias denied threatening the defendant with life in prison before he confessed to the robbery or showing the defendant a blue piece of paper and telling him that the paper meant he would receive life in prison or life without parole. The detective said that he did not tell the defendant that he would never see his family again if he did not confess to the robbery, or that the defendant would be free to leave if he confessed. Detective Frias recalled that the defendant told him that he had ADHD and bipolar disorder but that he was taking the appropriate medications for his conditions.

Sergeant Bonner confirmed that the defendant appeared to understand Detective Frias' questions. He also denied threatening the defendant, showing him a blue piece of paper to indicate that he would spend the rest of his life in prison, or telling him that he was never going to see his family again. He also denied promising the defendant anything to get him to talk or telling him that he could go home if he confessed.

-10-

In addition, none of the officers who interacted with the defendant believed the defendant to be under the influence of any substance.

The defendant's argument consists solely of his mere allegations, and the trial court determined that the defendant's testimony was not credible. The defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to establish that he is guilty of aggravated robbery. He specifically claims that no physical evidence connected him to the crime, no eyewitnesses identified him as a participant, and his confession was untrustworthy.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our

supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1).

The defendant does not dispute that an aggravated robbery took place; he only disputes his identity as one of the robbers. However, "[i]dentification of a defendant as the person who committed the offense for which he or she is on trial is a question of fact for the jury's determination upon consideration of all competent proof." State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

At trial, Isabel Hernandez described the two men who robbed her: both were African-American, one had on a Halloween mask and a short-sleeved shirt and the other had a bandana around part of his face and carried a black backpack. One of the men held a pistol and demanded money from a customer and for the victim to get money out of the register. The men took cell phones, cigarettes, contact lenses, and watches, essentially the "expensive things" that were kept at the front of the store, as well as one of the cash registers. The video surveillance system at the store captured the events and corroborated the victim's testimony.

Candido Hernandez testified similarly to the victim regarding the robbery. He explained that when he arrived at the store to visit the victim, he saw two people standing on the corner just outside the store and in the process of covering their faces. Inside the store, Hernandez saw one of the men aim a gun at the victim and demand money from the cash

-12-

register. Hernandez saw one of the men grab a cash register, and both men fled the store. Hernandez confirmed that the men took cell phones, cigarettes, and a computer from the front of the store.

Detective Frias testified that the defendant admitted participating in the robbery of the Foodland store on November 17, 2011. The defendant relayed specific facts of the robbery to the detective, which were consistent with information given by the victim and Hernandez. The defendant said that two other individuals, "Terry Townsend" and "Ray," were involved in the robbery with him. He recalled that Townsend was armed with a gun and that they took, among other things, a cash register and cigarettes. The defendant said that he wrapped a shirt around his head, Townsend put on a mask, and Ray entered the store pretending to be a customer. During the robbery, Townsend pointed a gun at "the Mexican lady" and demanded money, and they treated Ray like a customer and pointed a gun at his head. The defendant said that he was unable to open the cash register, so he took the register with him out of the store. When shown photographs of the scene, the defendant identified Townsend and Ray as the people "responsible for committing the robbery with [him]." The defendant said that all three of them wore black clothing, he had a black shirt tied around his head, Townsend wore "a screen mask," and Ray did not have on a mask. The defendant initialed and signed the statement as being true and accurate.

Sergeant Taylor prepared a still shot photograph from the store's surveillance video that showed the robbers entering the store, and the defendant identified himself as one of the suspects in the photograph.

Thus, the evidence presented at trial, including the testimony of the victim and Hernandez, the video of the robbery, and the defendant's confession to police sufficiently established the elements of aggravated robbery and the defendant's involvement in it. Again, with regard to the defendant's identity as one of the robbers, the defendant confessed to the crime and indicated details consistent with the testimony of the victim. Although the defendant may not have been truthful in his identifications of the other participants, the jury believed that the defendant still in fact committed the robbery. Any factual issues or questions concerning the credibility of the defendant's statement to police were resolved by the jury as the trier of fact. In the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find the defendant guilty of aggravated robbery.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE